IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STRATFORD GOODHUE and DOREEN GOODHUE, | ) Civ. No. 14-00006 ACK-KSC |
| Plaintiffs, | ) |
| v. | ) |
| COUNTY OF MAUI, a municipal corporation; DARRELL RAMOS, MAUI POLICE DEPARTMENT OFFICER, IN HIS INDIVIDUAL CAPACITY; ABSEL POLANCO, MAUI POLICE DEPARTMENT OFFICER, IN HIS INDIVIDUAL CAPACITY, AND DOES 3-30, | ) |
| Defendants. | ) |
| COUNTY OF MAUI, et al., | ) |
| Third-Party Plaintiffs, | ) |
| v. | ) |
| MAUI FAIR ALLIANCE and AVERY CHUMBLEY, | ) |
| Third-Party Defendants. | ) |

<u>ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

For the following reasons, the Court hereby DENIES

Plaintiffs' Motion for Partial Summary Judgment.

<u>FACTUAL BACKGROUND</u>[1]

---

[1] The facts as recited in this Order are for the purpose of
disposing of the current motion and are not to be construed as
(continued...)

This case arises out of an incident that occurred at the 2013 Maui County Fair. The Maui Fair is an annual event organized and run by Third Party Defendant Maui Fair Alliance. In 2013, the Maui Fair attracted over 90,000 visitors. (Mot., Ex. 1 (Chumbley Depo.) at 12, 76.) The fair is held at the War Veterans Memorial Complex, a public park owned and controlled by Defendant the County of Maui ("the County"). The park is bordered by Kaahumanu Avenue on the south, Kanaloa Avenue on the east, Baldwin High School on the west, and the War Memorial Stadium on the north.

The Maui Fair is open to the general public, but there is an admission fee for visitors to enter the fenced area (referred to as the "ticketed area within the paid gate"). (Mot., Ex. 1 (Chumbley Depo.) at 22.) There are three entrances, or "paid gates," into the ticketed area: the "Kanaloa Gate," located just off Kanaloa Avenue on the east end of Halia Nakoa Street; the "Baldwin Gate," located on the western end of Halia Nakoa Street; and the "Stadium Gate," located on the northern edge of the fairgrounds, next to the War Memorial Stadium and the stadium parking lot. (Maui Fair Alliance Opp'n, Ex. A (Chumbley Depo.) at 23-24.)

The Kanaloa Gate is the most heavily trafficked of the

---

[1]/(...continued)
findings of fact that the parties may rely on in future proceedings.

three entrances, with at least 25,000 paying visitors using it to enter the 2013 fair. (Mot., Ex. 1 at 29-30.) To reach the Kanaloa Gate, fairgoers must walk down a sidewalk bordered on one side by a narrow grass or dirt strip, and on the other side by Kanaloa Avenue, a five-lane road. (Maui Fair Alliance Opp'n, Ex. B (S. Goodhue Depo.) at 49-50; Mot., Ex. 1 (Chumbley Depo.) at 30.) The Kanaloa Gate is directly across Kanaloa Avenue from one of the main parking and bus drop-off areas for the fair. (Mot., Ex. 1 at 30.) Thus, to reach the Kanaloa Gate from the parking and drop-off areas, pedestrians must cross Kanaloa Avenue at one of several crosswalks or intersections; the Maui Police Department provides off-duty officers to work as traffic controllers to aid pedestrians in crossing the road and regulate traffic around the fair. (<u>Id.</u> at 30, 54.)

Plaintiffs Stratford and Doreen Goodhue ("Plaintiffs") are evangelical Christians. (Mot., Ex. 3 (S. Goodhue Depo.) at 21-22.) As part of their religious mission, they create and distribute gospel tracts, or small pamphlets discussing their religious beliefs. (<u>Id.</u> at 29-30.) In 2012, Plaintiffs distributed gospel tracts outside the Maui Fair, adjacent to the sidewalk on the west side of Kanaloa Avenue, approximately 100 feet from the Kanaloa Gate without incident. (<u>Id.</u> at 45-46.) The Plaintiffs believed that the Maui Fair was a unique opportunity to distribute gospel tracts because of the number of people in

one place at one time, and they decided to return to the fair the following year. (Id. at 142-43.)

During the 2013 fair, Plaintiffs stood distributing gospel tracts near a large banyan tree next to the Kanaloa Avenue sidewalk, approximately 50 to 150 yards away from the Kanaloa Gate. (Mot., Ex. 2 (Ramos Depo.) at 33, 35 (estimating Plaintiffs stood 40-50 feet from the gate); Ex. 1 (Chumbley Depo.) at 29 (estimating 50-50 yards from the gate).) Plaintiffs chose this location because of the large amount of foot traffic going towards the entrance to the fair. (Mot., Ex. 3 (S. Goodhue Depo.) at 48.) On Thursday, October 3, 2013, Plaintiffs distributed tracts in this location for approximately five hours without incident. Plaintiffs state that police officers walked past them approximately 25 times without saying anything about their conduct. (Mot., Ex. 3 (S. Goodhue Depo.) at 53-54, 76, 70.) Other members of Plaintiffs' church chose to distribute tracts in other places near the Kanaloa Gate, or near other gates to the fair. (Maui Fair Alliance CSF, Ex. B (S. Goodhue Depo.) at 120-125.) For example, one couple stood along the Kanaloa Avenue sidewalk, but on the other side of the Kanaloa Gate, near where fairgoers exited, rather than entered, the fair. (Id., Ex. E (D. Goodhue Depo.) at 20-25.)

On Friday, October 4 at approximately 8:00 p.m., Third Party Defendant Avery Chumbley, president of the Maui Fair

4

Alliance, observed Plaintiffs impeding pedestrian traffic on the sidewalk and approached Plaintiffs and requested that they leave the area. (Mot., Ex. 1 (Chumbley Depo.) at 31-32.) There is some dispute as to whether Plaintiffs were located on the sidewalk or next to it. Plaintiffs state that they stood "on or adjacent to" the sidewalk, and that, while they occasionally walked onto the sidewalk to distribute their tracts, they generally stayed off the sidewalk and simply extended their arms so that people could take their pamphlets as they passed. (Maui Fair Alliance Opp'n, Ex. B (S. Goodhue Depo.) at 33, 52-53; Pl.'s CSF ¶ 1.) Mr. Goodhue testified that pedestrians "wouldn't have to get around my arm to get past me[,]" and that he was not impeding pedestrians' progress. (Mot., Ex. 3 (S. Goodhue Depo.) at 53-54.)

Conversely, Mr. Chumbley asserts that he saw Plaintiffs standing on the sidewalk, blocking pedestrian traffic, and forcing pedestrians to slow down, stop, or walk out into Kanaloa Avenue to get around them. (Id., Ex. A (Chumbley Depo.) at 33.) George Kaho'ohanohano, the Maui Fair Alliance's police liaison, also states that he saw Plaintiffs blocking the sidewalk. (Id., Ex. C (Kaho'ohanohano Depo.) at 27-28.) After being confronted by Chumbley, Plaintiffs moved across Kaahumanu Avenue, in front of the police station, and continued handing out their tracts there; however, there was far less foot traffic in their new location. (Mot., Ex. 3 (S. Goodhue Depo.) at 73-75.)

The following day, Saturday, October 5, the Plaintiffs
returned to their original location near the Kanaloa Gate to
distribute their tracts at approximately 5:00 p.m. (Id. at 77-
78.) Mr. Goodhue states that he went to a ticket booth in an
attempt to speak with a Maui Fair official regarding the
distribution of the facts, but was unable to speak with anyone.
(Id. at 78, 80-82.) Plaintiffs distributed their tracts without
incident until approximately 7:30 or 8:00 p.m. (Id. at 82.)
Chumbley states that, at that point, he once more observed
Plaintiffs impeding pedestrian traffic and forcing pedestrians
into the roadway to get around the congestion, and therefore once
more approached Plaintiffs and asked them to leave. (Maui Fair
Alliance Opp'n, Ex. A (Chumbley Depo.) at 42-44.) Plaintiffs
responded that they believed they had a constitutional right to
remain where they were, but that they would leave if a police
officer "demands" it. (Id. at 43-44; Mot., Ex. 3 (S. Goodhue
Depo.) at 86.)

Chumbley thereafter contacted Kahoʻohanohano, who met
Chumbley at the Kanaloa Gate, along with two Maui County Police
officers, including Defendant Darrel Ramos. (Mot., Ex. 1
(Chumbley Depo.) at 47; Ex. 2 (Ramos Depo.) at 17-18.) At the
time, Ramos was off duty, working a "special duty" assignment at
the fair. (Mot., Ex. 2 (Ramos Depo.) at 74.) Kahoʻohanohano
states that he also saw Plaintiffs impeding pedestrian traffic

and forcing pedestrians into Kanaloa Avenue to get around them.
(Maui Fair Alliance, Ex. C (Kahoʻohanohano Depo.) at 27-28.)
Chumbley states that he explained his concerns about the
situation to Ramos, and told Ramos that the Maui Fair's permit
covered the area where Plaintiffs were standing, therefore
empowering him to request that they leave.[2/] (Id., Ex. A
(Chumbley Depo.) at 47-49.) Ramos states that the Maui Fair
Alliance officials "had [received] numerous complaints with these
people pushing pamphlets into passerby [sic] that may have been
construed as harassment," and "needed assistance because they
were concerned that their permit governed the area, and so they
wanted police involvement." (Mot., Ex. 2 (Ramos Depo.) at 26.)

When Ramos arrived on the scene, he observed Plaintiffs
"standing up on the side of the sidewalk," and did not see them
"pushing any pamphlets into passerbys [sic]." (Id. at 33.) Ramos
also stated that the area was not that crowded "at that specific
second that I was there," but that it was a "dead moment where
there's only 10 or 15 pedestrians on the sidewalk. 30 seconds

---

[2/] The parties disagree over whether the Kanaloa Avenue
sidewalk was within the area covered by the Maui Fair's event
permit. The permit documents do not include a map showing the
exact boundaries of the permitted area, and Chumbley testified
that Maui County officials had previously told him that the
sidewalk in question was within the permit. (Maui Fair Alliance
Opp'n, Ex. A (Chumbley Depo.) at 23.) Maui County's Rule 30(b)(6)
witness, however, testified that the fair's permit ended at the
fence separating the War Memorial complex from the Kanaloa Avenue
sidewalk and, thus, did not include the sidewalk area. (Id., Ex.
F (Vickers Depo.) at 62-64.)

later now you're bombarded with about 150." (<u>Id.</u> at 34-35.) Ramos approached Plaintiffs and explained that there had been "some complaints" about their activities and asked that they move across the street or to an area farther away from the Kanaloa Gate. (<u>Id.</u> at 46; Maui Fair Alliance Opp'n, Ex. D (Ramos Depo.) at 41.) Ramos stated that he believes Plaintiffs "probably" could have stayed in their original location "without committing a crime or potential crime" if they continued handing out their tracts "in a very peaceful manner." (Mot., Ex. 2 (Ramos Depo.) at 48.) He nevertheless asked them to leave because of the complaints the Maui Fair Alliance personnel stated they received, and because he believed the Maui Fair permit covered the location. (<u>Id.</u> at 49-51.)

Plaintiffs complied with Ramos's request and moved across the street where there was far less foot traffic. (Mot., Ex. 3 (S. Goodhue Depo.) at 86-87, 90.) Believing their First Amendment rights were violated, Plaintiffs brought the instant action.

<u>**PROCEDURAL BACKGROUND**</u>

On January 7, 2014, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief and Damages against the County of Maui and Doe Officers. (Doc. No. 1.) On March 5, 2014, the County of Maui filed a Third Party Complaint against the Maui County Fair Association and Avery Chumbley, asserting that the

8

damages alleged in Plaintiffs' Complaint were caused by the Third Party Defendants. (Doc. No. 14.) The County thereafter filed an Amended Third Party Complaint against the Maui Fair Alliance (presumably a correction of the entity's name) and Chumbley (together, the "Fair Defendants") on April 14, 2014, (Doc. No. 26,) and the Fair Defendants filed their Third Party Counterclaim against the County on April 21, 2014. (Doc. No. 29.) On May 12, 2014, Plaintiffs filed an Amended Complaint asserting substantially the same claims, but adding as named defendants Maui Police Department officers Darrell Ramos and Asbel Polanco. (Doc. No. 32.)

On December 24, 2014, Plaintiffs filed the instant Motion for Partial Summary Judgment as to Defendant Darrell Ramos, along with a concise statement of facts and numerous exhibits. (Doc. Nos. 65 & 66.) On March 12, 2015, the County filed its Memorandum in Opposition to the motion, supported by a concise statement of facts and a number of exhibits.[3/] (Doc. Nos. 72 & 73.) On the same day, the Fair Defendants filed their own Response in Opposition, along with a concise statement of facts and exhibits. (Doc. Nos. 74 & 75.) Plaintiffs filed a reply on March 19, 2015. (Doc. Nos. 78 & 79.) A hearing on the motion was held on April 2, 2015.

---

[3/] The County's memorandum in opposition is apparently filed on behalf of the County and Defendant Ramos.

**STANDARD**

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. Id. at 587.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . . or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that

10

there is some metaphysical doubt as to the material facts."
Matsushita, 475 U.S. at 585. "[T]he requirement is that there be
no genuine issue of material fact . . . . Only disputes over
facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary
judgment." Anderson, 477 U.S. at 247-48 (emphasis in original).
Also, "[t]he mere existence of a scintilla of evidence in support
of the non-moving party's position is not sufficient[]" to defeat
summary judgment. Triton Energy Corp. v. Square D Co., 68 F.3d
1216, 1221 (9th Cir. 1995). Likewise, the nonmoving party "cannot
defeat summary judgment with allegations in the complaint, or
with unsupported conjecture or conclusory statements." Hernandez
v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).

**DISCUSSION**

In the instant motion, Plaintiffs seek summary judgment
solely as to their claim against Defendant Darrell Ramos.
Plaintiffs have named Ramos as a defendant in his individual
capacity, and assert that Ramos violated their First Amendment
rights by preventing them from distributing their pamphlets on
the Kanaloa Avenue sidewalk. Accordingly, Plaintiffs seek relief
under 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen
> of the United States or other person within the
> jurisdiction thereof to the deprivation of any

11

rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the
party injured in an action at law, suit in
equity[.]

Thus, to prevail on their § 1983 claim against Ramos,
Plaintiffs must prove two essential elements: (1) "that a right
secured by the Constitution or laws of the United States was
violated," and (2) "that the alleged violation was committed by a
person acting under the color of State law." <u>Long v. Cnty. of Los
Angeles</u>, 442 F.3d 1178, 1185 (9th Cir. 2006).

## I.   **Whether Ramos Was Acting Under Color of State Law**

As an initial matter, the Court must address whether
Sergeant Ramos was acting under color of state law during the
incident in question, such that Plaintiffs may bring their § 1983
claim against him. "[G]enerally, a public employee acts under
color of state law while acting in his official capacity or while
exercising his responsibilities pursuant to state law." <u>West v.
Atkins</u>, 487 U.S. 42, 50 (1988).

Here, the parties do not appear to dispute that
Defendant Ramos was acting pursuant to his official
responsibilities as a police officer on the day at issue. Ramos
was off duty; however, he was working a special duty assignment
and had been tasked by the Maui County Police Department to
provide security at the Maui County Fair. He was wearing his
police uniform, including his police belt and gun, and he
maintained the power to make arrests and enforce the law, just as

12

he does during any special duty assignment. (See County CSF ¶ 12; Mot., Ex. 2 (Ramos Depo.) at 74-76.)

Moreover, when Ramos approached Plaintiffs, he introduced himself as a sergeant with the Maui Police Department. (Mot., Ex. 2 (Ramos Depo.) at 38.) Thus, when Ramos directed Plaintiffs to move the location of their proselytizing activities, he was doing so pursuant to his responsibilities as a police officer with the Maui Police Department and, thus, was acting under color of state law for purposes of § 1983. See, e.g., Griffin v. Maryland, 378 U.S. 130, 135 (1964) ("If an individual is possessed of state authority and purports to act under that authority, his action is state action."); Traver v. Meshriy, 627 F.2d 934, 938 (9th Cir. 1980) (off-duty officer who identified himself as such acted under color of law).

## II. Whether A Constitutional Violation Occurred

Having concluded that Defendant Ramos was acting under color of state law at the time of the incident, the Court next turns to the issue of whether Ramos violated Plaintiffs' constitutional rights. Here, Plaintiffs assert that Ramos violated their First Amendment rights of freedom of speech, assembly, and religious exercise. (Am. Compl. (Doc. No. 32) at 16.)

The First Amendment plainly protects Plaintiffs' right to proselytize in the proverbial town square. See, e.g., Hurley

13

v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 579 (1995) ("Our tradition of free speech commands that a speaker who takes to the street corner to express his views . . . should be free from interference by the State based on the content of what he says."); Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981) ("[T]he oral and written dissemination of . . . religious views and doctrines is protected by the First Amendment."). Indeed, the parties do not dispute that Plaintiffs' desired activity - handing out religious tracts on the sidewalk outside of the fair entrance - constitutes protected speech. Accordingly, the Court must first determine the forum type in which Plaintiffs were located, which will in turn determine the appropriate standard applicable to a review of the disputed state action.

### A. Forum Type

The extent to which activity protected by the First Amendment may be limited depends on the locale in which the speech or conduct takes place. See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44-46 (1983) (noting that the "the First Amendment does not guarantee access to property simply because it is owned or controlled by the Government"; rather, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the

14

property at issue." (internal quotations omitted)). This requires the Court to determine the nature of the forum at issue, and then to apply an appropriate standard of scrutiny to decide whether a restriction on speech in that forum passes constitutional muster. Id. If the forum is a traditional or open public forum, the state's restrictions on speech are subject to stricter scrutiny than are restrictions in a limited public forum. Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001).

Here, the parties dispute whether the sidewalk upon which Plaintiffs were located was a traditional public forum or a limited public forum. Plaintiffs assert that, regardless of whether Plaintiffs stood inside or outside of the bounds of the fair permit, because they were located on a sidewalk that remained open to the public, they were in a traditional public forum. (See Reply at 9-10.) The County argues that Ramos was constitutionally permitted to ask Plaintiffs to move where he held a reasonable, but mistaken belief that Plaintiffs were located within the permitted area because such an area constitutes a limited public forum. (County Opp'n at 3-8.)

Specifically, relying on Villegas v. Gilroy Garlic Festival Association, the County asserts that permit holders may constitutionally exclude individuals from limited public fora. 541 F.3d 950 (9th Cir. 2008). Thus, according to the County, when Ramos was informed that Plaintiffs were in the area covered by

the permit and that the Fair Defendants wanted them to leave, he did not violate Plaintiffs' constitutional rights by directing them to do so. (County Opp'n at 8.) It appears to be undisputed that, on the date in question, Ramos believed Plaintiffs were standing within the bounds of the fair permit. (Pl.'s CSF at 2; County CSF ¶¶ 10-11, 13; Maui Fair Alliance CSF at 3-4.)

As Plaintiffs point out, however, Villegas is readily distinguishable from the instant case. Specifically, Villegas involved a First Amendment claim by individuals who paid to enter the private, ticketed area of a festival, and were allegedly ejected because of their clothing. Villegas, 541 F.3d at 954. While the parties dispute whether Plaintiffs were, in fact, located within or outside of the permitted area (as discussed below), there is no dispute that they were not located within the ticketed area within the paid gate of the Maui Fair. (Pl.'s CSF at 1; County CSF ¶ 3; Maui Fair Alliance CSF at 3.) Thus, to the extent the Ninth Circuit in Villegas held that a private, permitted event is considered a limited public forum for purposes of constitutional analysis, it is inapplicable to the instant case, which involved an area that remained open to the public.

Moreover, numerous cases have indicated that public sidewalks that remain open to the public, whether inside or outside the bounds of privately sponsored, state-permitted events, are considered traditional public fora and analyzed as

16

such. See, e.g., Dietrich v. John Ascuaga's Nugget, 548 F.3d 892, 897 (9th Cir. 2008) (finding that a public sidewalk encompassed within a permitted event remains a traditional public forum when otherwise open to the general public); Gathright v. City of Portland, 439 F.3d 573, 577-78 (9th Cir.), cert. denied, 549 U.S. 815, 127 S. Ct. 76 (2006) (stating that a privately sponsored, city-permitted event open to the public constituted a public forum); ACLU of Nevada v. City of Las Vegas, 333 F.3d 1092, 1100-01 (9th Cir. 2003) (stating that a factor to be considered in whether an area is a traditional public forum is "the actual use and purposes of the property, particularly status as a public thoroughfare and availability of free public access to the area."). See also United States v. Grace, 461 U.S. 171, 177-80 (1983) (rejecting a contention that public sidewalks adjacent to the Supreme Court building should be treated differently from other typical public sidewalks where the sidewalks were "indistinguishable from any other sidewalks in Washington, D.C." in that there was "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave.").

Here, the Court concludes that, regardless of whether the sidewalk area outside of the Kanaloa Gate was technically encompassed by the Fair Defendants' permit, it remained a

17

traditional public forum. In so finding, the Court relies upon
the undisputed fact that this area was a public thoroughfare on
which the public could freely walk without having to pay any
admission fee. See ACLU of Nevada, 333 F.3d at 1101 ("Use of a
forum as a public thoroughfare is often regarded as a key factor
in determining public forum status." (citing cases)); Parks v.
City of Columbus, 395 F.3d 643, 652 (6th Cir. 2005) (concluding
that a city street within the bounds of a special permit issued
to an arts festival remained a traditional public forum,
notwithstanding the permit, where the street remained open to the
public) (cited with approval in Dietrich and Gaithright); see
also Pl.'s CSF at 1; County CSF ¶ 3; Maui Fair Alliance CSF at 3.
Moreover, the physical characteristics of the sidewalk area did
not delineate it as a special, limited area. See ACLU of Nevada,
333 F.3d at 1101. Specifically, the area in which Plaintiffs
stood was outside of the fence encircling the ticketed area
within the paid gate, and there was otherwise no physical
delineation indicating that the sidewalk area was other than a
typical public forum. See Grace, 461 U.S. at 180 (critiquing
attempt to classify as nonpublic forums that provide "no
separation . . . and no indication whatever to persons . . . that
they have entered some special type of enclave.").

    In sum, the Court concludes that, regardless of whether
Plaintiffs were located within or outside of the bounds of the

Fair Defendants' permit, their claims must be analyzed in accordance with the standard applied to a traditional public forum. The Court therefore turns next to that analysis.

**B.  Applicable Standard of Review and Application**

As discussed above, Plaintiffs were located on a public sidewalk, a "quintessential public forum," where protection for freedom of speech is at its height. Burson v. Freeman, 504 U.S. 191, 196 (1992); Dietrich, 548 F.3d at 896-97. In traditional public fora, "the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication." Burson, 504 U.S. at 197.

As an initial matter, Plaintiffs do not appear to dispute that Ramos's request that Plaintiffs relocate was content neutral. In other words, Plaintiffs have not asserted that the Fair Defendants and Ramos requested that Plaintiffs relocate because of the content of their speech. The Court therefore turns to addressing whether Ramos's action in asking Plaintiffs to relocate across Kanaloa Avenue was "narrowly tailored to serve a significant governmental interest." See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

A regulation is narrowly tailored if it (a) "promotes a substantial government interest that would be achieved less

effectively absent the regulation," and (b) does not "burden substantially more speech than is necessary to further the government's legitimate interests." Id. at 799 (citation and internal quotes omitted). The U.S. Supreme Court stated that

> a regulation of the time, place, or manner of
> protected speech must be narrowly tailored to
> serve the government's legitimate, content-neutral
> interests but . . . it need not be the least
> restrictive or least intrusive means of doing so.
> Rather, the requirement of narrow tailoring is
> satisfied so long as the regulation promotes a
> substantial government interest that would be
> achieved less effectively absent the regulation.

Id. at 798-99. Thus, in Ward, the Supreme Court concluded that the fact that New York City's limitations on volume at a concert in Central Park "may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." Id. at 802.

Here, the County and the Fair Defendants assert that Ramos's restriction on Plaintiffs' speech was aimed at preventing congestion and preserving pedestrian safety. (Maui Fair Alliance Opp'n at 16; County Opp'n at 11.) Plaintiffs counter that Ramos did not see any safety issues or crimes being committed himself, and that his actions were motivated solely by the Fair Defendants' request that he eject Plaintiffs from what they believed to be an area covered by their permit. (See generally Reply.)

To the extent Ramos asked Plaintiffs to relocate in order to prevent pedestrian congestion and ensure pedestrian safety, the government's interest may be considered significant. Generally, the government "has a strong interest in ensuring the public safety and order [and] in promoting the free flow of traffic on public streets and sidewalks." <u>Madsen v. Women's Health Ctr., Inc.</u>, 512 U.S. 753, 768 (1994); <u>Kuba v. 1-A Agr. Ass'n</u>, 387 F.3d 850, 858 (9th Cir. 2004) (stating that the interests of "preventing traffic congestion and ensuring the safety of pedestrians" are "indeed significant, as many cases have recognized."). <u>See also</u> <u>Heffron v. Int'l Soc. for Krishna Consciousness, Inc.</u>, 452 U.S. 640, 650 (1981) ("As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."); <u>Dietrich</u>, 548 F.3d at 898 (noting that, if the defendants had restricted speech "to protect safety or the free flow of pedestrian traffic, we would face a different question.").

The Ninth Circuit has made clear, however, that merely invoking interests in regulating pedestrian traffic around an event is insufficient; the government must also show that the proposed communicative activity endangers those interests. <u>Kuba</u>, 387 F.3d at 859; <u>see also</u> <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 664 (1994) ("That the Government's asserted interests

are important in the abstract does not mean, however, that the
[challenged restriction] will in fact advance those interests.");
Klein v. City of San Clemente, 584 F.3d 1196, 1202 (9th Cir.
2009) (same). Here, questions of fact preclude a determination as
to whether Plaintiffs' proselytizing activities were in fact
impeding pedestrian traffic and causing a hazardous pedestrian
situation.

On the one hand, there is some evidence that the Fair
Defendants observed Plaintiffs impeding pedestrian safety.
Specifically, Chumbley states that he observed Plaintiffs
interfering with pedestrian traffic on the sidewalk and forcing
pedestrians into the roadway to get around the congestion. (Maui
Fair Alliance Opp'n, Ex. A (Chumbley Depo.) at 42-44, 47.)
Similarly, Kahoʻohanohano states that he also saw Plaintiffs
impeding pedestrian traffic and forcing pedestrians into Kanaloa
Avenue to get around them. (Maui Fair Alliance, Ex. C
(Kahoʻohanohano Depo.) at 27-28.) Moreover, there is no dispute
that at least one pedestrian has been struck by a car during the
Maui Fair on Kanaloa Avenue in recent years, resulting in a
lawsuit against the fair. (Pl.'s CSF in Supp. of Reply ¶ 4; Maui
Fair Alliance CSF at 6.)

On the other hand, Ramos's testimony regarding
Plaintiffs' purported interference with pedestrian safety is far
less clear. He states that the Maui Fair Association officials

"had [received] numerous complaints with these people pushing pamphlets into passerby [sic] that may have been construed as harassment." (Mot., Ex. 2 (Ramos Depo.) at 26.) When Ramos arrived on the scene, he observed Plaintiffs "standing up on the side of the sidewalk," and did not see them "pushing any pamphlets into passerbys [sic] or doing anything weird." (Id. at 33.) Ramos also stated that the area was not that crowded "at that specific second that I was there," but that it was a "dead moment where there's only 10 or 15 pedestrians on the sidewalk. 30 seconds later now you're bombarded with about 150." (Id. at 34-35.) Nevertheless, Ramos stated that he believes Plaintiffs "probably" could have stayed in their original location "without committing a crime or potential crime" if they continued handing out their tracts "in a very peaceful manner." (Mot., Ex. 2 (Ramos Depo.) at 48.) Similarly, Mr. Goodhue himself testified that pedestrians "wouldn't have to get around my arm to get past me[,]" and that he was not impeding pedestrians' progress. (Mot., Ex. 3 (S. Goodhue Depo.) at 53-54.)

Further, there is at least some evidence that pedestrian safety was not implicated at all in the decision to remove Plaintiffs from the Kanaloa Avenue sidewalk. Indeed, Ramos made a number of statements indicating that his purpose in asking Plaintiffs to relocate was not to ensure pedestrian safety, but, rather, to enforce what he believed to be the permit-holders'

right to exclude people from within what he believed was the permitted area. (See Mot., Ex. 2 at 49-50, 52-53, 63-64.) Moreover, at the direction of Chumbley, several individuals distributed leaflets outside of the Kanaloa Gate without incident at the 2014 fair. (Pl.'s CSF at 5.) The Fair Defendants assert that these individuals were standing to the side of the Kanaloa Avenue sidewalk, rather than on it (as they assert Plaintiffs were); however, Plaintiffs dispute that characterization of their location. (Reply at 7-8.) In light of all of the conflicting testimony, material questions of fact exist as to whether Plaintiffs' First Amendment activities actually impeded the purported government interest in protecting pedestrian safety.

Furthermore, there are material questions of fact as to whether there were ample alternatives for Plaintiffs' communication. Plaintiffs state that Ramos "suggested" that they move across the street where there was not as much foot traffic. (Pl.'s CSF at 4; see also County's CSF, Ex. A (Ramos Depo.) at 68 (stating that Ramos didn't believe that he "ordered them" to move, and that "[i]t was a genuine information conversation".) Ramos, however, disputes that there was insufficient foot traffic across the street. (Maui Fair Alliance CSF, Ex. D (Ramos Depo.) at 41 (discussing Plaintiffs' new location and stating that "[t]here's like tons of people there".) Plaintiffs acknowledge that they only remained at the new location for approximately a

24

half hour. (Pl.'s CSF at 4.) Moreover, it is undisputed that
other members of Plaintiffs' church were stationed and leafleting
at various places around the fair boundaries. (Maui Fair Alliance
CSF at 6; Pl.'s Reply CSF at 4.) Finally, Plaintiffs acknowledge
that of the 12,000 leaflets printed for the fair, they handed out
10,000. (Pl.'s CSF at 4.) Thus, the Court concludes that
questions of fact preclude a determination as a matter of law as
to whether the Plaintiffs' remaining avenues of communication
were inadequate. See Ward, 491 U.S. at 798-99 ("[A] regulation of
the time, place, or manner of protected speech must be narrowly
tailored to serve the government's legitimate, content-neutral
interests but . . . it need not be the least restrictive or least
intrusive means of doing so.").

        In sum, in light of the questions of material fact that
exist in this case, the Court cannot make a determination as a
matter of law at this time as to whether Ramos violated
Plaintiffs' First Amendment rights.

**III.** **Whether Ramos is Entitled to Qualified Immunity**

        Because, as discussed above, questions of fact preclude
a determination as to whether Ramos violated Plaintiffs'
constitutional rights, a material factual dispute likewise exists
as to whether Ramos is entitled to qualified immunity. See
Saucier v. Katz, 533 U.S. 194, 201 (2001) (stating that the first
prong of the qualified immunity test requires the Court to

determine whether the officer's conduct violated a constitutional right). The County asserts, however, that Ramos is entitled to qualified immunity because, even assuming Plaintiffs' rights were violated, Plaintiffs have failed to show that Ramos violated clearly established law.

Qualified immunity protects an official who "reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right." <u>Hunt v. Cnty. of Orange</u>, 672 F.3d 606, 615-16 (9th Cir. 2012). Assessing whether an official is entitled to immunity is a two prong inquiry. Under the first prong the Court asks whether the officer's conduct violated a constitutional right. <u>Saucier</u>, 533 U.S. at 201. Under the second prong, the Court examines whether the right was clearly established. <u>Id.</u> The Court may examine either prong first, and may grant qualified immunity on the ground that a purported right was not "clearly established" without resolving the question of whether the right exists at all. <u>Reichle v. Howards</u>, 123 S. Ct. 2088, 2093 (2012).

To be "clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987) (internal quotation marks omitted). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." <u>Ashcroft</u>

v. al-Kidd, 131 S. Ct. 2074, 2083 (2011). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202. "Whether the law was clearly established is an objective standard; the defendant's subjective understanding of the constitutionality of his or her conduct is irrelevant." Karl v. City of Mountlake Terrace, 678 F.3d 1062, 1073 (9th Cir. 2012) (quoting Clairmont v. Sound Mental Health, 632 F.3d 1091, 1100 (9th Cir. 2011)). Thus an officer whose actions in fact violate clearly established law may nonetheless be entitled to qualified immunity if those actions are reasonable in light of the information the officer had at the time of the arrest. Mendocino Env. Center v. Mendocino Cnty, 14 F.3d 457, 463 (9th Cir. 1994). Indeed, it is oft stated that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991).

Here, the County asserts that Ramos mistakenly, but reasonably, believed that Plaintiffs were standing inside the bounds of the fair's event permit, based upon what Chumbley told him, and that he was therefore authorized to direct Plaintiffs to move. The County further argues that Ramos did not violate any "clearly established" law, because his belief that the permit holders had a right to exclude private citizens from their

27

permitted event was reasonable in light of the existing case law. (See County Opp'n at 10-14.) The Court disagrees.

To the extent the evidence demonstrates that Ramos directed Plaintiffs to relocate because the Fair Defendants asked him to and he believed Plaintiffs to be located within the fair's permit, several Ninth Circuit cases had clearly established at the time that a traditional public forum remains a traditional public forum even if an entity holds a permit including that area, provided that the area otherwise remains open to the general public. See Dietrich, 548 F.3d at 898 (holding that exclusion of a person from a permitted event open to the public because of the asserted right of the permittees to exclude anyone expressing a political message violated the First Amendment); Gaithright, 439 F.3d at 576-77 (holding unconstitutional a policy allowing permittees unfettered discretion to exclude private citizens from permitted events open to the public). Even if Ramos believed the permit covered the area in which Plaintiffs were standing, Ramos was aware, and it is undisputed, that that area remained open to the public. (Pl.'s CSF at 1; County CSF ¶ 3; Maui Fair Alliance CSF at 3.) Thus, if Plaintiffs' First Amendment rights were restricted solely because the Fair Defendants (the permit holders) wanted Plaintiffs to move, clearly established law at the time forbid such a restriction.

Importantly, however, as noted above, there is a

factual dispute as to whether Ramos directed Plaintiffs to move because the permit holder Fair Defendants requested him to do so due to their concerns (as expressed to him) regarding pedestrian safety and congestion, or simply because he believed the Fair Defendants had a right to exclude them from the permitted area. (See Maui Fair Alliance Opp'n, Ex. A (Chumbley Depo.) at 42-44, 47; Ex. C (Kahoʻohanohano Depo.) at 27-28; Pl.'s CSF in Supp. of Reply ¶ 4; Maui Fair Alliance CSF at 6.) To the extent Plaintiffs were, in fact, directed to move in order to protect safety or the free flow of pedestrian traffic, Plaintiffs' right to proselytize in that exact location may not have been clearly established. See, e.g., Dietrich, 548 F.3d at 898 (noting that "the government has a strong interest in ensuring the public safety and promoting the free flow of traffic on public streets and sidewalks"). Because, however, the Court cannot determine as a matter of law whether Plaintiffs were directed to move because they presented a risk to pedestrian safety, or simply because the permit holders wanted them removed, questions of fact likewise preclude a determination as to whether Ramos is entitled to qualified immunity.

Similarly, as discussed above, there are material questions of fact as to whether there were ample alternatives for Plaintiffs' communications. Thus, to the extent the County seeks

summary judgment[4/] on the issue of qualified immunity, the County's request is DENIED.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 6, 2015



_____
Alan C. Kay
Senior United States District Judge

Goodhue v. Maui, Civ. No. 14-00006 ACK KSC, Order Denying Plaintiffs' Motion for Partial Summary Judgment.

---

[4/] Pursuant to Local Rule 56.1(i), the County seeks summary judgment against Plaintiffs as to the issue of qualified immunity. (County Opp'n at 14.)